Filed 11/8/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C082057 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F07578) |
| v. | |
| LONNIE GLENN SCHMIDT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Donald J. Currier, Judge. Affirmed in part and reversed in part.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, the majority opinion is certified for publication with the exception of parts A, B, D, E, F, G, H, I, J, K, L, and M of Section II. The minority opinion is not certified for publication.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Galen N. Farris, Deputy Attorney General, for Plaintiff and Respondent.

Following a lengthy jury trial in which he represented himself, defendant Lonnie Glenn Schmidt was convicted of four counts of prohibited practices by a foreclosure consultant (counts 1-2, 29-30—Civ. Code, § 2945.4, subds. (a) and (e)), ten counts of filing false instruments (counts 3, 4, 6, 8, 10, 12, 13, 15, 18, 26—Pen. Code, § 115, subd. (a)),[1] six counts of identity theft (counts 5, 7, 9, 11, 14, 16—§ 530.5, subd. (a)), one count of second degree burglary (count 17—§ 459), one count of perjury (count 19—§ 118, subd. (a)), three counts of grand theft (counts 20, 27-28—§ 487, subd. (a)), and five counts of attempted grand theft (counts 21-25—§§ 664, 487, subd. (a)).  The trial court sentenced defendant to a total of 28 years in state prison plus one year consecutive in the county jail.

On appeal, defendant argues, and the People concede, that: (1) insufficient evidence supports the convictions for violations of Civil Code section 2945.4, subdivisions (a) and (e) in counts 29 and 30, and (2) the grand theft convictions on counts 20 or 21, on the one hand, and 27 or 28 on the other, are barred by the multiple takings doctrine set forth in *People v. Bailey* (1961) 55 Cal.2d 514, 518-519 (*Bailey*).  We accept the People's concessions and shall reverse the convictions on counts 20, 28, 29, and 30.

Defendant also argues that the evidence does not support the convictions for violations of section 115, subdivision (a) in counts 3 and 26.  We agree and shall reverse the convictions on counts 3 and 26 as well.

Defendant also argues the trial court should have stayed his sentence on counts 17, 20 to 25, and 27 to 28.  The People concede that the sentence should have been stayed on count 21.  We accept the concession and remand for resentencing on count 21.  We reject

---

[1] Undesignated statutory references are to the Penal Code.

2

defendant's contention that the sentence should have been stayed on the other enumerated counts.

Defendant also argues, and the People also concede, that the trial court erred in reducing the conviction for second degree burglary in count 17 to misdemeanor shoplifting under Proposition 47, and sentencing him to one year consecutive, rather than eight months. We accept the People's concession and remand for resentencing on count 17.

We reject defendant's remaining contentions.

## I. BACKGROUND

Defendant managed a home foreclosure rescue operation, doing business as Second Opinion Services and Financial Services Bureau Limited. He hired and supervised Alan, who testified for the prosecution under a grant of immunity. Neither defendant nor Alan was a licensed real estate broker, real estate agent, or attorney, and neither had registered with the State as a foreclosure consultant.

A.    *Defendant's "Mortgage Rescission" Program*

According to Alan, defendant developed a "mortgage rescission" program that allowed financially distressed homeowners to avoid foreclosure and receive "fee simple title control" of their properties, free and clear of their mortgages. Under the program, homeowners paid an enrollment fee, and then signed quitclaim deeds transferring their properties to trusts created by defendant, with defendant as trustee. At defendant's instruction, homeowners would then stop paying their mortgages (if they had not done so already) and instead make monthly lease payments to defendant. Defendant told homeowners that the monthly lease payments would continue for a period of five years, after which, he claimed, they would own their homes free and clear.

During the trial, the jury heard from multiple prosecution witnesses that defendant's mortgage rescission program failed to work as advertised. The jury heard

evidence about a number of transactions, involving a number of properties. We describe two such transactions in detail and provide a more general overview of the others.

1.      *The Walnut Avenue Property (Counts 1-3, 18, 20, and 21)*

Hector owned a home on Walnut Avenue in Orangevale. Hector fell behind on his mortgage payments and went into default in October 2010. He heard about defendant's program from a friend and reached out for help. Defendant told Hector that he knew a way to save the house and gain title free and clear of the mortgage, but "it was going to cost [him]."

Defendant explained that Hector would pay an enrollment fee of $6,500, transfer the property to "an entity," and "lease the house back from the entity for $891 monthly" for a period of five years. He would then make a balloon payment of $75,000, which, defendant said, he could easily pay by refinancing, as he would now own the house free and clear.

Hector paid the $6,500 enrollment fee and signed a quitclaim deed in February or March 2011 transferring the house to a trust known as the H&H Barbershop Trust. Although defendant told Hector that he would have control over the property through the H&H Barbershop Trust (which was named for Hector's business), the abstract of trust, which defendant did not show Hector, identified defendant and Alan as trustees and gave them "absolute and exclusive power and control over the management and conduct of the business and affairs of the trust." Hector would not have signed the quitclaim deed had he known that he would be ceding control of the property to defendant.

Hector made monthly lease payments for several months, beginning in April and ending in September 2011. He stopped making payments to defendant on the advice of an attorney and instead resumed making monthly payments to his mortgage lender. Eventually, he managed to obtain a loan modification which allowed him to keep his house. Defendant was not involved in the process of securing the loan modification.

4

Sometime later, a man appeared at Hector's house. The man identified himself as an associate of defendant, and claimed that Hector's house belonged to him. A short time later, in July 2013, Hector received a letter from defendant, asserting that defendant was now the owner of the house and claiming that Hector owed him more than $20,000 in back rent.

Later still, Hector learned that the quitclaim deed he had signed in 2011 had been recorded on July 16, 2013. Hector also learned that a document entitled "assumption agreement," in which the H&H Barbershop Trust purported to assume Hector's loan obligations, had been recorded the next day. Hector was forced to hire an attorney to clear title to the house. During the trial, the jury heard evidence that defendant had attempted to sell the Walnut Avenue property to Don, a real estate speculator who was willing to find investors for the property, going so far as to open an escrow for the property with Orange Coast Title Company in Sacramento.

2.      *The School Street Property (Counts 26-30)*

Janet and Robert owned a home on School Street in Elk Grove. They ran into some financial difficulty in 2011 and contacted defendant. They were not living in their home at the time; rather, they had rented the property, and were traveling the country in their retirement in a fifth wheel trailer.

They were current on their mortgage, but the house was underwater and they wanted to reduce their mortgage payments. Defendant told Janet and Robert that there was something wrong with their loan agreement, which would allow him to cancel their mortgage. He explained that his program would require them to transfer their property to a trust, but they would continue to own the property and could continue to lease it. Defendant told Janet and Robert that they would no longer make monthly mortgage payments to their lender, but would instead pay a reduced amount to another entity over a period of five years, followed by a balloon payment, which would be paid by refinancing. Janet and Robert were impressed by defendant's presentation and eager to improve their

5

financial situation. They signed a contract to join defendant's program that very day. The contract called for a $6,500 enrollment fee, monthly payments of $951, and a balloon payment of $85,000.

Janet and Robert paid the enrollment fee and signed a quitclaim deed conveying their interest in the School Street property to a trust known as the "Forever Blessed Trust." They stopped making their mortgage payments, signed a lease agreement with the Forever Blessed Trust, and instructed their tenants to send monthly rental payments to defendant. When all was said and done, Janet and Robert paid defendant more than $18,000. Janet and Robert were not aware that the Forever Blessed Trust was governed by an abstract of trust created by defendant, naming defendant as trustee and granting defendant "absolute and exclusive control" over the management and disposition of the property. They would not have signed the quitclaim deed had they understood that they were ceding control of the property to defendant.

Fannie Mae acquired title to the School Street property as a result of a trustee's sale, which took place, unbeknownst to Janet and Robert, on April 22, 2013. The next day, the Forever Blessed Trust recorded a quitclaim deed purporting to convey the property to defendant. In the months that followed, defendant recorded a "notice of rescission of trustee's deed upon sale" purporting to rescind the trustee's deed of sale by which Fannie Mae acquired title to the property, and another quitclaim deed purporting to convey Fannie Mae's interest in the property to himself. Defendant signed both documents as an authorized representative of Fannie Mae; however, defendant had no such authorization.

Fannie Mae regularly acquires property through foreclosure, and tries, as a matter of policy, to sell such property as quickly as possible. Fannie Mae was unable to follow its usual policy in the case of the School Street property, as the documents described above—two quitclaims deeds and a purported notice of rescission of trustee's sale— created a cloud on title that interfered with Fannie Mae's ability to market and sell the

6

property.  To make matters worse, someone repeatedly broke into the house and changed the locks.  During this time, defendant attempted to rent the School Street property to a new tenant and offered the property to Don for sale to an investor.

In the end, Fannie Mae was forced to bring an action to remove the cloud on title. The trial court took judicial notice of a judgment entered in Fannie Mae's favor on July 28, 2014.  Fannie Mae incurred attorneys' fees of $17,792 and estimated maintenance and holding costs of $18,399 as a result of the litigation.

> 3.      *Other Properties:  Iceberg Lane (Counts 6, 7, and 23), Woodfield Way (Counts 8, 9, and 24), Cornelia Way (Counts 10, 11, and 25) and Azalea Road (Counts 4, 5, and 22)*

Fannie Mae acquired title to real property on Iceberg Lane in Roseville following a trustee's sale in July 2013, and Woodfield Way, also in Roseville, following a trustee's sale in August 2013.  A short time later, on September 27, 2013, defendant recorded grant deeds with the Placer County Recorder's Office purporting to transfer Fannie Mae's interest in the Iceberg Lane and Woodfield Way properties to himself.  Defendant signed the deeds as an authorized representative of Fannie Mae, without authorization to do so.

J.P. Morgan acquired title to real property on Azalea Road in Sacramento following a trustee's sale in September 2009.  Several years later, on August 8, 2013, a grant deed was recorded with the Sacramento County Recorder's Office purporting to transfer J.P. Morgan's interest in the Azalea Road property to defendant.  Defendant signed the grant deed as an authorized representative of J.P. Morgan, without authorization to do so.

J.P. Morgan acquired title to real property on Cornelia Way in Sacramento following a trustee's sale in August 2013.  A short time later, on September 27, 2013, a grant deed was recorded with the Sacramento County Recorder's Office purporting to transfer J.P. Morgan's interest in the Cornelia Way property to defendant.  Defendant

7

signed the grant deed as an authorized representative of J.P. Morgan, without authorization to do so.

Defendant attempted to sell the properties through Don, opening escrows for sales to investors with Orange Coast Title Company in September 2013. The escrows fell through when a concerned escrow officer contacted the title company's legal department.

As we shall discuss, defendant argues the prosecution failed to establish venue in Sacramento County for counts 6 and 8, both of which charged defendant with recording false or forged instruments with the Placer County Recorder's Office in violation of section 115. Defendant also argues the sentences imposed for counts 22 to 25 for attempted grand theft (§§ 664/487) (discussed below) should have been stayed pursuant to section 654.

B.      *Trial Court Proceedings*

Defendant was charged in an amended information with two counts of unlawfully demanding or receiving compensation prior to fully performing services that a foreclosure consultant has contracted to perform or represented that he would perform (counts 1 and 29—Civ. Code, § 2945.4, subd. (a)), two counts of unlawfully acquiring an interest in a residence in foreclosure with whom a foreclosure consultant has contracted (counts 2 and 30—Civ. Code, § 2945.4, subd. (e)), ten counts of filing false instruments 3, 4, 6, 8, 10, 12, 13, 15, 18, 26—§ 115, subd. (a)), six counts of identity theft (counts 5, 7, 9, 11, 14, 16—§ 530.5, subd. (a)), one count of second degree burglary (count 17—§ 459), one count of perjury (count 19—§ 118, subd. (a)), three counts of grand theft (counts 20, 27-28—§ 487, subd. (a)), and five counts of attempted grand theft (counts 21-25—§§ 664, 487, subd. (a)).

The information further alleged that defendant took property of value exceeding $65,000 (§ 12022.6, subd. (a)(1)) and $200,000 (§§ 12022.6, subd. (a)(2), 1203.045), and the offenses involved a pattern of fraud and embezzlement with a taking of more than $100,000 and more than $500,000 (§ 186.11, subd. (a)). The information further alleged

8

that defendant committed the offenses charged in counts 6 through 11 while out on bail. (§ 12022.1.)

1. *Waiver of Right to Counsel*

Defendant filed a motion to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) in December 2014, approximately one month before the then-scheduled trial date. The motion indicated that defendant wanted to represent himself because his appointed counsel, Attorney Robert Saria, was unwilling to file various motions to dismiss the information on defendant's behalf. The motion also indicated that Attorney Saria "would remain as trial counsel of record in the event defendant so requests."

Defendant appeared before the trial court (Sapunor, J.) for a hearing on the motion on January 9, 2015. The trial court warned defendant of the dangers of self-representation, noting that "the penalties if you're found guilty are severe." The trial court continued, "Could be eighteen years, could be 25 years or a little bit more, but it's serious business." The trial court also cautioned defendant that he would not have a right to advisory counsel if he chose to represent himself, stating, "There is no right to standby counsel for assistance, and we don't do it."

Defendant affirmed that he still wanted to represent himself. The trial court granted defendant's motion. The trial date was subsequently vacated and reset.

2. *Requests for Advisory Counsel*

Several months later, on May 12, 2015, defendant filed a motion for appointment of advisory counsel. The motion stated: "Defendant is ready, willing and able to present his own defense on the merits, but recognizes his need for help in court protocol and procedure at trial."

Defendant appeared for a hearing on the motion before the trial court (Davidian, J.) on May 19, 2015. Defendant explained that he was "facing a fairly complex trial," reiterating that he wanted advisory counsel "for really just the procedural aspects to be

9

able to conduct the—the court protocol, things of that nature." Judge Davidian acknowledged that advisory counsel may be appointed "[i]n the sound discretion of the trial judge." He noted that the court is not required to appoint advisory counsel (see *People v. Debouver* (2016) 1 Cal.App.5th 972, 976) adding that: "We don't have counsel funds, advisory counsel funds in Sacramento County. We don't have the ability to pay for that sort of thing. We don't have—we don't provide advisory counsel."

He then denied the motion, stating: "As we discussed in your *Faretta* motion, this is on you. You have to know how this is done. That's why I—I strenuously advised you against exercising *Faretta* rights that gave you the right to do that. In fact, granted it, but you would be held to the same standard, and you will be. [¶] And so, your request for advisory counsel is denied. This is in the discretion of the [c]ourt, especially for what you've asked for, that—that they have—he or she have a very limited role of advising you about what proper protocol is. You're expected to know that because you elected to represent yourself. [¶] So the motion is denied." (Italics added.)

Defendant filed a second motion for appointment of advisory counsel two weeks later, on June 2, 2015. The motion argued that Judge Davidian had been incorrect in stating that Sacramento County does not provide advisory counsel for pro se defendants, noting that he was aware of another pro se defendant whose motion for appointment of advisory counsel had been granted. As before, defendant represented that he was "ready, willing and able to present his own defense on the merits," but recognized his "need for help in court protocol and procedure during pre-trial motion practice and procedure at trial."

Defendant appeared before Judge Currier for a hearing on the motion (and other matters) on June 5, 2015. Judge Currier began by noting that defendant had previously requested advisory counsel, and Judge Davidian had denied the request. Judge Currier continued: "I'm not sure why Judge Davidian used that language, it's probably a bit overbroad, but you could be entitled to advisory counsel. But in Sacramento County, we

10

use a pro per coordinator to ensure that you're getting the resources you need to prepare your defense." Judge Currier asked defendant to explain why these resources were not sufficient.

Defendant responded at length, arguing that the investigator and pro per coordinator were not as available to him as he would like, and the process of communicating with them was cumbersome. Defendant maintained that he wanted to represent himself, because he wanted to tell his own story, and he believed he was in the best position to do so. Nevertheless, defendant acknowledged that an attorney would be helpful, adding that he was hoping that advisory counsel would offer input on making appropriate objections and calculating deadlines.

Judge Currier responded: "I would consider appointing you an attorney or I will consider increasing the resources available to you, but I'm not inclined to give you advisory counsel. You're not entitled to that under the law." When defendant asked why advisory counsel had recently been appointed for another pro se defendant, but not him, Judge Currier responded that he was not familiar with the facts of the other case. He concluded: "I see that a previous judge has denied you advisory counsel, I have heard the arguments, I have looked at your pleadings and listened to your argument, and I don't see any persuasive reason why I should give you advisory counsel." Accordingly, Judge Currier denied defendant's second request for advisory counsel.

3.     *Alan's Testimony*

As noted, Alan was defendant's longtime business associate, who testified for the prosecution under a grant of immunity. During the prosecution's case-in-chief, Alan reviewed records for 60 entities created to hold title to an equal number of distressed properties as part of defendant's mortgage rescission program. Of the 60 properties held by these 60 entities, none, other than Hector's, had been returned to the homeowner. Even so, Alan testified that the "primary objective" of defendant's program was "[t]o return a fee simple title control to the client."

11

Defendant cross-examined Alan at length, over the course of three days. On cross-examination, Alan testified, inter alia, that he had consulted with attorneys, and conducted his own legal research, and believed defendant's program to be legal. Alan testified that some of the entities holding distressed properties were turned over to homeowners, and agreed with defendant that they intended to turn all such entities over to homeowners "at some point." However, Alan acknowledged on redirect that, of the sixty properties discussed during his direct examination, a majority had been foreclosed upon. Alan also acknowledged that he had not said anything about turning entities or trusts over to homeowners during his earlier testimony or in interviews with law enforcement. Alan was excused subject to recall.

Sometime later, defendant advised the trial court that he intended to call Alan as a witness for the defense. The prosecutor responded that the prosecution was not required to offer immunity to Alan for his testimony as a defense witness. The trial court heard argument on the issue several days later. During the course of the hearing, defendant argued that Alan was a "key witness," who would corroborate defendant's testimony, authenticate documents, and vouch for defendant's business practices and character. The trial court ruled that the court could neither force an offer of immunity for Alan, nor force him to testify in the event that he invoked his Fifth Amendment right against self-incrimination.

Alan appeared before the trial court several days later. Defendant reiterated that he planned to question Alan about defendant's business practices and character. Alan responded that he intended to invoke his Fifth Amendment rights. Defendant decided not to call Alan in view of the trial court's earlier ruling. The trial court dismissed Alan.

### 4. *John's Testimony*

John is a real estate attorney in Sacramento who met with defendant in August 2011 to discuss the structure of a transaction that defendant was working on. Defendant identified John as a witness for the defense.

12

During an Evidence Code section 402 hearing, the prosecutor expressed concern that John might be used to offer opinion testimony as to the legality of defendant's mortgage rescission program (which had previously been found to be illegal) or hearsay evidence regarding the substance of his meeting with defendant. Defendant responded that he intended to question John as a percipient witness to the August 2011 meeting. The trial court warned defendant that the prosecutor would object to questions about what was said at the meeting on hearsay grounds, asking, "Do you have an exception to the hearsay rule that you plan to use?" Defendant responded, in part, "I'm not sure what the evidentiary exception would be other than we had a meeting to discuss the particulars of the program and my understandings of what the law required, not so much of what the interpretation of the law was or what—trying to work on the merits of the law or whether it's right or wrong, other than that I felt here's what I was doing based on the legal requirements that—as I understood the law to be, for my position with my people to work and what can be done to facilitate that, what areas needed to be improved on, whether I was on the right track, things of that nature, any input on how I worked with the entities, the reason for the entities, things of that nature that were totally, you know, not part of the rescission processes but things of that nature that we went through." The trial court reiterated, "when you start talking about who said what to who, you better have an exception to the hearsay rule or [the prosecutor's] objections will be sustained."

John took the stand on October 19, 2015, and offered an overview of the August 2011 meeting. Defendant then asked John a series of questions about what was discussed at the meeting, drawing hearsay objections from the prosecutor, which were sustained. The trial court admonished defendant to refrain from eliciting hearsay testimony, unless he could make an offer of proof that an exception applied. Defendant protested, "I would just like to be able to ask him what he recalled about the meeting and the questions that were raised and addressed in a narrative form." The trial court responded, "Sir, you were explained about the hazards of representing yourself, one of which is unfamiliarity with

13

the [E]vidence [C]ode. And unless you have an exception to the hearsay rule, then the law would look at anything you said outside of court as self-serving testimony—or self-serving statements and so they would be inherently unreliable in accordance with the law unless there was some exception." The trial court again admonished defendant to refrain from eliciting out-of-court statements unless he could point to an exception to the hearsay rule.

Defendant continued to ask John questions about what was discussed at the meeting. The prosecutor continued to object, and the trial court continued to sustain the objections. After some time, the trial court stated, "Mr. Schmidt, I warned you three times now. I'm going to ask you one more time to not ask questions that elicit out-of court statements. If you persist and ignore my warnings, I will terminate your examination of this witness." Defendant acknowledged that he was having "difficulty articulating and understanding the hearsay rules," and ended his examination of John. John was excused subject to recall.

Defendant asked to recall John the following week, on October 26, 2015, (the 45th day of trial). When asked why he wanted to recall John, defendant responded, "I had difficulty qualifying and getting the hearsay exception and I said I needed time to study that up a little bit to get into non-hearsay and relevance and all of these different things that would allow the testimony that was conducted at the meeting to be elicited. I didn't get to first base on that." The trial court responded, "I'm not going to allow you to call an attorney back to the stand because of your wanting to revisit the material that you had an opportunity to ask him about the first time. [¶] We have spent way too much time on this trial. You've spent time going over things that I told you not to go over with the witnesses and I'm not going to let you recall witnesses because you forgot to ask a question or you did not know the rules of evidence." With that, the trial court denied defendant's request.

14

### 6. *Defendant's Testimony*

Defendant testified on his own behalf. Defendant explained that he had spent time in federal prison in the 1990s and used the time to study federal law. He recalled that he conceived the idea for the mortgage rescission program in 2008, with the goal of helping people to stay in their homes as long as possible. He described the program at length, claiming that he had formed an understanding, on the basis of his own research, that the law allows borrowers to rescind their loan agreements in a variety of circumstances, none of which appears to have merit (and none of which are before us on appeal). By way of example, defendant testified that a borrower can rescind a loan agreement when the lender fails to make certain disclosures or fails to produce the original note. (But see *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 505 [production of the note is not required to perfect foreclosure], disapproved on other grounds by *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 926.)

On cross-examination, defendant acknowledged that he was named as trustee for approximately 60 trust entities, each of which held property transferred by quitclaim deed, over which he exercised absolute control, either individually or with Alan, his employee. Defendant also acknowledged that none of the homeowners who participated in his program succeeded in having their mortgages rescinded, and only one—Hector— was able to avoid foreclosure and remain in his home.

Defendant also acknowledged that he had previously been convicted of conspiracy to impede and impair the I.R.S., conspiracy to commit witness tampering, and five counts of witness tampering and aiding and abetting witness tampering in federal court in North Carolina in 1990, and one count of conspiracy in federal court in California in 1990. Defendant acknowledged that the North Carolina case alleged that defendant used sham trust entities as part of a program designed to eliminate tax liabilities, which was similar in structure to the mortgage rescission program in the present case. However, defendant

15

maintained that the conviction was erroneous, claiming he had researched the law and believed he was legally entitled to structure tax avoidance transactions as he had.

### 5. *Jury Instructions*

The trial court instructed the jury on December 3, 2015, after 68 days of trial. As relevant here, jurors were instructed with CALCRIM No. 375 that they could consider evidence of defendant's prior convictions and other transactions arising out of his mortgage rescission program on the "specific grounds of relevance" of intent, motive, knowledge, common plan or scheme, or absence of accident or mistake. Defendant did not object to the instruction.

### 6. *Verdict and Sentence*

The jury received the case on December 8, 2015—the 72nd day of trial—and reached a verdict the next day. The jury found defendant guilty on all counts, and found true the allegations that his takings exceeded $65,000 and $200,000, and the offenses involved a pattern of fraud and embezzlement with takings exceeding $100,000 and $500,000. The jury also found true the allegation that defendant committed counts 6 through 11 while out on bail.

The trial court then sentenced defendant to the upper term of four years on count 19 (§ 118, subd. (a)), and one-third the middle term on all remaining counts, all consecutive to count 19, with the exception of count 17, the second degree burglary (§ 459). The trial court reduced the felony burglary charge to a misdemeanor shoplifting charge (§ 495.5), and sentenced defendant to one year consecutive on that count. The trial court sentenced defendant to an additional five years for the section 186.11 enhancement and two years for the section 12022.6, subdivision (a)(2) enhancement, for a total term of 28 years in state prison and one year consecutive in county jail.

The trial court also imposed various fines, fees, and assessments, including a restitution fine of $4,800 (§ 1202.4), a parole revocation fine of $4,800 (§ 1202.45), which was stayed, a $1,200 court operations assessment (§ 1465.8), and a $900 court

16

facilities assessment (Gov. Code, § 70373). Defendant did not object or otherwise indicate he would be unable to pay these amounts.

Defendant filed a timely notice of appeal.

## II. DISCUSSION

A.      *Sufficiency of Evidence Supporting Counts 29 and 30*

Defendant challenges the sufficiency of the evidence supporting the convictions on counts 29 and 30, which allege violations of Civil Code section 2945.4, subdivisions (a) and (e), respectively, in connection with his dealings with Janet and Robert. Defendant argues, and the People concede, that the convictions cannot stand because the prosecution failed to present evidence that Janet and Robert occupied the School Street property at the time of the alleged violations. (See *In re Phelps* (2001) 93 Cal.App.4th 451, 453, fn. 3, and 458 [Civil Code section 2945.1 incorporates the definition of "residence in foreclosure" set forth in Civil Code § 1695.1, and applies only to homeowners who live in the residence when the offense occurs].) We accept the People's concession and shall reverse the convictions on counts 29 and 30.[2]

B.      *Application of the Bailey Doctrine to Counts 20-21 and 27-28*

Defendant argues the trial court erred by not applying the *Bailey* doctrine to combine counts 20 and 21, on the one hand, and counts 27 and 28, on the other, into two counts of grand theft, one against Hector and the other against Janet and Robert.[3] The People concede the error, and we accept the concession. (See *Bailey, supra,* 55 Cal.2d at

---

[2] Because we reverse the convictions on counts 29 and 30 for insufficient evidence, we need not consider defendant's argument that the trial court misinstructed the jury on the law applicable to a violation of Civil Code section 2945.4.

[3] Defendant was convicted in count 20 of grand theft (§ 487, subd. (a)) for taking fees from Hector and in count 21 of attempted grand theft (§§ 664/487, subd. (a)) for taking or attempting to take his real property. He was convicted in count 27 for taking fees from Janet and Robert and in count 28 for taking their real property.

17

p. 519 [holding that a defendant may be convicted of multiple counts of grand theft for a series of wrongful acts if the evidence shows that the offenses are separate and distinct and were not committed "pursuant to one intention, one general impulse, and one plan"]; *People v. Whitmer* (2014) 59 Cal.4th 733, 735 (*Whitmer*) [reexamining *Bailey* and holding that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme," but declining to apply holding retroactively].)

Relying on *Bailey*, defendant argues, and the People concede, that counts 20 and 21 must be combined into one count of grand theft against Hector, and counts 27 and 28 must be combined into one count of grand theft against Janet and Robert. The parties agree, as do we, that the crimes were committed before *Whitmer* was decided, and the counts involving Hector (counts 20 and 21), on the one hand, and Janet and Robert (counts 27 and 28), on the other, were each committed as part of a single overarching scheme to defraud distressed homeowners by means of the mortgage rescission plan.[4] We therefore reverse defendant's grand theft convictions in counts 20 and 27.

---

[4] Although the theft of fees (counts 20 and 27) and the attempted theft and theft of property (counts 21 and 28) occurred at different times, the People properly acknowledge that the jury's verdict supports the existence of two overarching schemes, one targeting Hector and the other targeting Janet and Robert. As the People observe, the jury found the losses for counts 1 through 30 exceeded $200,000, but none of the named victims in those counts individually suffered a loss of more than $200,000. Consequently, the jury's finding must have been based on the theory that defendant utilized a "common scheme or plan" in bilking his victims. (See CALCRIM No. 3220 [jury may add together loss suffered by each victim to determine whether total losses exceed $200,000 where the prosecution proves the defendant intentionally took property in each crime and the losses arose from a common scheme or plan].) The jury also found true the allegation that defendant engaged in a pattern of related conduct involving losses exceeding $100,000 and $500,000 (§ 186.11, subd. (a)(1) and (2)), which required proof that defendant committed at least two felonies that had "the same result or similar purpose, result, principals, victims, or methods of commission, or [were] otherwise interrelated by distinguishing characteristics, and that [were] not isolated events." (CALCRIM No.

18

*C.     Filing False or Forged Documents (Counts 3 and 26)*

Defendant challenges the sufficiency of the evidence to support the convictions on counts 3 and 26, which charged him with violating section 115 by filing false or forged quitclaim deeds for the Walnut Avenue (count 3) and School Street (count 26) properties. Specifically, defendant argues that there was insufficient evidence that the quitclaim deeds were false or forged because Hector, Janet and Robert actually owned the Walnut Avenue and School Street properties and were legally entitled to quitclaim them to defendant. The People respond that the quitclaim deeds were false within the meaning of section 115 because they were induced under false pretenses and had the effect of clouding title. Defendant has the better argument.

Section 115 provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." (§ 115, subd. (a).) The purpose of section 115 is "to prevent the recordation of spurious documents knowingly offered for record." (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681-682 (*Generes*); see also *People v. Feinberg* (1997) 51 Cal.App.4th 1566, 1579 [" 'The core purpose of . . . section 115 is to protect the integrity and reliability of public records' "].)

Section 115 can be violated in two ways: (1) by procuring or offering a *false* instrument for filing; or (2) by procuring or offering a *forged* instrument for filing. (*Generes, supra,* 106 Cal.App.3d at p. 682.) Defendant's convictions on counts 3 and 26 were based on the theory that defendant knowingly procured or offered false quitclaim

---

3221.) These findings support the conclusion that defendant employed a single plan to steal from Hector, and another single plan to steal from Janet and Robert. Thus, the evidence, when examined through the prism of *Bailey,* compels the conclusion that defendant acted pursuant to two single schemes, "all motivated by one intention, one general impulse, and one plan," to take money from Hector, on the one hand, and Janet and Robert, on the other. (*Bailey, supra,* 55 Cal.2d at p. 519.)

19

deeds for filing.[5]  We must therefore determine whether substantial evidence supports a finding that the quitclaim deeds were "false" within the meaning of section 115, a task which requires us to determine the proper interpretation of the statute.  Although we review a jury's findings of guilt for substantial evidence, statutory interpretation is a question of law we review de novo.  (*People v. Spriggs* (2014) 224 Cal.App.4th 150, 154.)

Another panel of this court considered the application of section 115 to a "false" instrument in *Generes.*  There, the defendant recorded a deed that purported to transfer from herself to herself an easement over land she did not own.  (*Generes, supra,* 106 Cal.App.3d at p. 681.)  The defendant was charged with violating section 115.  (*Ibid.*)  The justice court overruled the defendant's demurrer to the complaint.  (*Ibid.*)  The defendant then petitioned the superior court for a writ of prohibition.  (*Ibid.*)  The superior court issued a peremptory writ, stating:  " 'It appears from the face of the complaint that [the defendant] filed a document which was exactly what it purported to be:  to wit, a deed from herself to herself granting herself an easement over land she did not own.  The court does not rule that this conduct is legal.  It merely states now that it is not a violation of . . . section 115.' "  (*Ibid.*)

The People appealed, arguing that the superior court applied an overly narrow construction of the word "false."  (*Generes, supra,* 106 Cal.App.3d at p. 681.)  This court agreed, emphasizing the fact that section 115 differentiates between false and forged instruments.  (*Generes, supra,* at p. 682.)  "Obviously," the court observed, "an instrument may have the effect of defrauding one who acts on it as genuine even though it does not bear a forged signature or otherwise meet the technical requirements of a forged instrument."  (*Ibid.*)  "Here," the court explained, "the lack of an ownership

---

[5] The prosecutor argued that the quitclaim deeds were false, not forged.

interest in the land goes to the deception itself. If Generes did not own the interest she purported to convey, the instrument she filed was clearly false. Having no right to grant or convey an easement, her recording of a deed transferring an easement would establish a cloud on the title of those persons who lawfully owned interests in the land. A title searcher encountering the spurious document who acted upon it as genuine would of course be materially deceived." (*Ibid*.)

The Court of Appeal for the Fourth District, Division Two, considered similar facts in *People v. Denman* (2013) 218 Cal.App.4th 800, 804-806 (*Denman*). There, the defendant recorded quitclaim deeds and homestead declarations on nine properties that he believed to have been abandoned in order to acquire them by adverse possession. (*Id.* at pp. 804-807.) The defendant had no claim of title to the properties and was convicted of 20 counts of violating section 115. (*Denman, supra,* at p. 804.) On appeal, he argued that the quitclaim deeds were not false within the meaning of section 115, as they only purported to transfer any interest he actually had in the properties. (*Denman, supra,* at pp. 807-810.) The appellate court rejected the defendant's argument, stating: "Here, defendant filed quitclaim deeds to himself on property to which he admitted he had no title or interest. While defendant is technically correct that he attested in the quitclaim deed that he was only transferring whatever title or interest he possessed, it was clearly based on the evidence he had absolutely no interest in the property. The documents themselves were false in that they transferred an interest that he did not have to himself and then he recorded the document, clouding the title of the true property owners. Adopting defendant's reasoning would be in direct contradiction with the purpose behind section 115 to preserve and protect the integrity of public records. Based on the purpose of the statute and the fact that section 115 has been broadly construed, the quitclaim deeds could reasonably be considered false documents by the jury." (*Id.* at p. 809.)

Defendant persuasively distinguishes *Generes* and *Denman*, noting that Hector, Janet and Robert actually owned the Walnut Avenue and School Street properties and

21

could legally convey their interests to the H&H Barbershop and Forever Blessed Trusts if they so chose. Unlike the instruments found to have been false in *Generes* and *Denman*, there was no evidence that the quitclaim deeds forming the bases for counts 3 and 26 were false in the sense that they purported to transfer interests that the grantors did not lawfully possess. (See *Generes, supra,* 106 Cal.App.3d at p. 682 [if defendant "did not own the interest she purported to convey, the instrument she filed was clearly false"]; *Denman, supra,* 218 Cal.App.4th at p. 809 [although the quitclaim deeds stated the defendant was only transferring whatever title or interest he possessed, the deeds were "false in that they transferred an interest that [defendant] did not have"].) To the contrary, the evidence showed that Hector, Janet and Robert actually owned the Walnut Avenue and School Street properties, and intended to transfer them to the H&H Barbershop and Forever Blessed Trusts, respectively, by means of the quitclaim deeds. Although an instrument may be false in other ways not specified in *Generes* or *Denham*, there was no evidence that the quitclaim deeds underlying counts 3 and 26 were anything other than what they purported to be. On the record before us, we conclude the evidence was insufficient to support a finding that the quitclaim deeds were false.

The People resist this conclusion, arguing that the quitclaim deeds were induced by fraud. That may be so, but the People have not directed our attention to any authority establishing that fraud in the inducement renders an instrument "false" within the meaning of section 115, and we decline to so hold. We reiterate that section 115 reaches instruments which, "*if genuine*, might be filed, registered, or recorded under any law of this state . . . ." (§ 115, subd. (a), emphasis added.) A fraudulently induced deed, though voidable, is nevertheless "genuine" in the sense that it conveys title and can be relied upon and enforced by a bona fide purchaser. (See, e.g., *Fallon v. Triangle Management Services, Inc.* (1985) 169 Cal.App.3d 1103, 1106 ["If a grantor is aware that the instrument he is executing is a deed and that it will convey his title, but is induced to sign and deliver by fraudulent misrepresentations or undue influence, the deed is voidable and

22

can be relied upon and enforced by a bona fide purchaser"].)  By contrast, "a forged document is void *ab initio* and constitutes a nullity; as such it cannot provide the basis for a superior title as against the original grantor."  (*Wutzke v. Bill Reid Painting Service, Inc.* (1984) 151 Cal.App.3d 36, 43; see *City of Los Angeles v. Morgan* (1951) 105 Cal.App.2d 726, 733 ["An instrument that is void *ab initio* is comparable to a blank piece of paper and so necessarily derives no validity from the mere fact that it is recorded"].)  Likewise, a deed altered without authority before delivery or recording (see, e.g., *Montgomery v. Bank of America Nat. Trust & Savings Ass'n* (1948) 85 Cal.App.2d 559, 563), or a deed procured by fraud in the inception (as opposed to fraud in the inducement) (see, e.g., *Erickson v. Bohne* (1955) 130 Cal.App.2d 553, 555-557), is void and conveys no title to the grantee.  (See generally 3 Miller & Starr, Cal. Real Estate (4th ed. 2019) §§ 8:53-8:54, pp. 8-155 - 8-160 [discussing the difference between void and voidable instruments in the context of altered and fraudulently induced deeds].)

In the absence of evidence that the quitclaim deeds underlying counts 3 and 26 were forged or false in the sense that they would not convey title to a bona fide purchaser, we must conclude that they were operative, and must therefore be considered "genuine." (See *Fallon v. Triangle Management Services, Inc., supra,* 169 Cal.App.3d at p. 1106 ["Until a voidable deed is declared void it is fully operative"].)  Being genuine, the quitclaim deeds cannot be said to have been "false" within the meaning of section 115. On the record before us, we conclude that there was insufficient evidence to support a finding that the quitclaim deeds underlying counts 3 and 26 were false.  We must therefore reverse those convictions.

D.     *Venue (Counts 6 and 8)*

Defendant contends the convictions on counts 6 and 8 must be reversed, because Sacramento County was not a proper venue for trial of these counts, both of which charged defendant with violating section 115, subdivision (a) by offering false

23

instruments for filing with the Placer County Recorder.[6] The People respond that defendant's venue challenge has been forfeited. We agree with the People. Defendant objected to venue in Sacramento County on counts 6 and 8 prior to trial. The prosecution acknowledged the venue issue, but argued that there was a sufficient nexus for the crimes to be tried in Sacramento County. The trial court overruled defendant's objection, but invited him to renew the objection in the event the prosecution failed to establish a sufficient nexus. Although defendant moved for acquittal towards the end of the trial, the motion made no mention of venue and could not have constituted a timely venue challenge in any case. (*People v. Simon* (2001) 25 Cal.4th 1082, 1104 ["a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue—either at trial or on appeal"].) We therefore conclude that defendant has forfeited his venue challenge to counts 6 and 8. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1076 [" ' " '[W]hen a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal' " ' "].)

*E.      Faretta Waiver*

Next, defendant argues that his *Faretta* waiver was invalid because the trial court incorrectly advised him that his maximum sentence would be 25 years and eight months, rather than 28 years and eight months.[7] We perceive no error.

---

[6] Count 6 charged defendant with violating section 115 by filing a false instrument in connection with the Iceberg Lane property; count 8 charged defendant with violating the same statute, in the same manner, in connection with the Woodfield Way property.

[7] The trial court sentenced defendant to 28 years in state prison plus one year consecutive in county jail; however, the parties agree that the trial court erred in reducing defendant's burglary conviction (count 7) to a misdemeanor under Proposition 47, and should have sentenced him to eight months rather than one year consecutive. For the reasons discussed herein, we agree.

24

Under the Sixth Amendment, a criminal defendant "has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." (*Faretta, supra,* 422 U.S. at p. 807.) " ' "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." ' " (*People v. Burgener* (2009) 46 Cal.4th 231, 241.)

Another panel of this court has held that a defendant desiring to represent himself must be advised of "the maximum punishment that could be imposed if the defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself." (*People v. Jackio* (2015) 236 Cal.App.4th 445, 455 (*Jackio*); but see *People v. Bush* (2017) 7 Cal.App.5th 457, 469-474 [collecting cases and concluding that advisement of penal consequences is not constitutionally required].) We assume without deciding that the defendant must be accurately advised of the maximum punishment that could be imposed.

Here, the trial court warned defendant that he faced 18 to 25 years in prison, or "a little more." Although the trial court imposed a longer sentence of 28 years in prison plus one year consecutive in county jail, the four-year difference in sentence will be entirely eliminated as a result of our rulings herein. Thus, defendant will ultimately receive a sentence within the range that the trial court described. Under the circumstances, we conclude that defendant was adequately advised of the maximum possible sentence that could be imposed. Considering the " 'record as a whole' " (*People v. Burgener, supra,* 46 Cal.4th at p. 241), we conclude that defendant was aware of the risks of self-representation and knowingly and intelligently waived his right to counsel. (*Faretta, supra,* 422 U.S. at p. 835.)

*F.*     *Requests for Advisory Counsel*

Defendant argues the trial court erred in denying his requests for advisory counsel. We disagree.

It is settled that a defendant who elects to represent himself has no constitutional right to advisory counsel or any other form of hybrid representation. (*People v. Moore* (2011) 51 Cal.4th 1104, 1119-1120; see also *People v. Debouver, supra,* 1 Cal.App.5th at p. 976.) The decision to grant or deny a request for advisory counsel is discretionary and will not be set aside absent a showing the ruling is arbitrary, capricious, or whimsical. (*People v. Crandell* (1988) 46 Cal.3d 833, 863.) In ruling on such a request, the trial court may consider defendant's demonstrated legal abilities and reasons for seeking the appointment of advisory counsel, including evidence of any manipulative purpose. (*Id.* at pp. 863-864.) Other factors include the seriousness of the charges, the complexity of the issues, and defendant's education and familiarity with the justice system. (*Ibid.*; *People v. Bigelow* (1984) 37 Cal.3d 731, 743-744.) "[T]he right to the assistance of counsel, guaranteed by the state and federal Constitutions, has never been held to include a right to the appointment of advisory counsel to assist a defendant who voluntarily and knowingly elects self-representation." (*People v. Crandell, supra,* at p. 864.)

Defendant argues the trial court failed to exercise discretion in denying his requests for advisory counsel. As previously discussed, defendant made two requests for advisory counsel over a period of less than three weeks. We consider each request in turn.

At the beginning of the hearing on the first request, Judge Davidian correctly observed that the decision whether to appoint advisory counsel rests "[i]n the sound discretion of the trial judge." Moments later, however, Judge Davidian remarked, "[w]e don't have counsel funds, advisory counsel funds in Sacramento County" and "we don't provide advisory counsel." Relying on these remarks, and pointing to the colloquy between Judge Sapunor and Attorney Saria at the hearing on his *Faretta* motion,

26

defendant argues that Sacramento County maintains a policy against appointing advisory counsel, which renders any exercise of discretion meaningless. We do not believe the record establishes the existence of such a policy. Although Judge Davidian expressed an unwillingness to appoint advisory counsel, and noted the existence of budgetary constraints that may have informed the exercise of his discretion, he stopped well short of saying that advisory counsel was unavailable as a matter of policy. What's more, defendant's own papers in support of his second motion for advisory counsel (discussed in greater detail below) specifically argued that Judge Davidian was incorrect to suggest that Sacramento County does not appoint advisory counsel and represented that defendant was aware of another pro se defendant for whom advisory counsel had been appointed. We cannot conclude, on the basis of this record, that the trial court lacked discretion to appoint advisory counsel, or engaged in a meaningless exercise of discretion, due to the existence of a policy against the appointment of advisory counsel.

In any case, the record establishes that Judge Davidian properly exercised his discretion here. He listened to defendant's reasons for requesting advisory counsel, invited the prosecutor to respond, and expressed doubt that anyone from the Public Defender's Office would be willing to accept an appointment for the limited purpose of advising defendant on procedural matters. He then denied the request, reiterating that, "This is in the discretion of the court, especially for what you've asked for, that—that they have—he or she have a very limited role of advising you about what proper protocol is. You're expected to know that because you elected to represent yourself." Reading the record as a whole, and placing his remarks in context, we conclude that Judge Davidian was well aware of his discretion to appoint advisory counsel, and properly considered defendant's reasons for seeking appointment of advisory counsel, in declining to do so. (Cf. *People v. Crandell, supra,* 46 Cal.3d at p. 864 [trial court failed to exercise discretion by summarily denying for advisory counsel, stating, " 'there's no such thing' "].)

27

We reach a similar conclusion with respect to defendant's second request. As previously discussed, Judge Currier heard defendant's second request during the course of a pretrial hearing on June 5, 2015. Judge Currier began the discussion by noting that Judge Davidian's earlier remarks may have been "a bit overbroad," and acknowledging that defendant "could be entitled to advisory counsel." Judge Currier then invited defendant to explain why the pro per coordinator and defense investigator were not sufficient. Following argument, Judge Currier responded, "I would consider appointing you an attorney or I will consider increasing the resources available to you, but I'm not inclined to give you advisory counsel. You're not entitled to that under the law."

As before, defendant urges us to construe an isolated remark—here, Judge Currier's statement that "You're not entitled to [advisory counsel] under the law"—as a sign that the trial court failed to appreciate its discretion. Again, we decline to do so. Judge Currier's statement was correct as a matter of law (see *People v. Crandall, supra,* 46 Cal.3d at p. 864), and was made in the context of a larger discussion in which Judge Currier made clear that he was aware of his discretion. During the course of the hearing, Judge Currier elicited argument concerning defendant's reasons for seeking advisory counsel, considered the sufficiency of the resources already available to defendant, and evaluated defendant's understanding of the charges against him. He also considered the complexity of the case. Judge Currier then denied the request, stating, "I have heard the arguments, I have looked at your pleadings and listened to your argument, and I don't see any persuasive reason why I should give you advisory counsel." That Judge Currier rejected defendant's arguments does not mean that he failed to consider them. As before, nothing suggests that Judge Currier failed to appreciate his discretion.

Building on the premise that Judges Davidian and Currier failed to exercise discretion (which we have already rejected), defendant next argues that anything short of an order appointing advisory counsel would have been an abuse of discretion given the complexity of the case and lengthy sentence defendant would face if convicted.

28

Assuming arguendo that a trial court may abuse its discretion in denying advisory counsel in a noncapital case (compare *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1430 [questioning whether a pro per defendant in a noncapital case may challenge a trial court's decision not to appoint advisory counsel] with *People v. Sullivan* (2007) 151 Cal.App.4th 524, 554 [recognizing the propriety of such a challenge]), there was no abuse of discretion here.

The denial of a timely request for advisory counsel may be an abuse of discretion when the case is unusually complex and the defendant is unusually unfamiliar with the law. (See *People v. Bigelow, supra,* 37 Cal.3d at pp. 743-744.) However, this rule of law presupposes that advisory counsel will meaningfully participate in the defense. Here, defendant was adamant that *he* would "control the case," and advisory counsel would serve as a kind of Rutter Guide come to life, not speaking except when spoken to, and then offering only abstract guidance on such routine matters as how to cross-examine a witness, how to calculate filing deadlines, and whether and under which circumstances defendant might consider making an objection, and if so, which one. Although the charges against him may have been serious, and the issues complex, defendant envisioned that advisory counsel would only be necessary "to assist defendant when and if defendant requests help in the mechanics and protocol of court procedure." There was never any suggestion that advisory counsel was needed to guide defendant in the development or presentation of any complex issue, whether factual or legal. To the contrary, defendant insisted that he was the best person to present his defense because, as he told Judge Currier, "that's my life, that's what I've been dealing with[,] and I've been doing everything I can to do it properly and according to the law." That defendant may have miscalculated does not establish any abuse of discretion.

The record reflects that defendant was an articulate and intelligent person who was no stranger to the criminal justice system, having been convicted of other crimes. The record also reflects that defendant had previously operated a training facility for

29

paralegals and considered himself an expert on legal issues arising from his mortgage rescission program.[8] Defendant demonstrated the ability to competently act as his own attorney during pretrial proceedings and in discussions with the trial court. He filed multiple motions to dismiss, requested discovery, and repeatedly sought and received adjustments to the ancillary legal services to which he was entitled. He likewise mounted a vigorous defense at trial, interposing objections, cross-examining witnesses, and testifying on his own behalf. Although defendant ultimately failed to convince the jury, this was not a case where the lack of advisory counsel created a trial that "could rightly be described as a ' "farce or a sham." ' " (*People v. Bigelow, supra,* 37 Cal.3d at p. 745.) We therefore conclude that the trial court did not abuse its discretion by denying defendant's requests for advisory counsel.

G.     *Refusal to Extend Immunity to Alan*

Defendant next argues that the prosecutor selectively granted immunity for Alan's testimony as a prosecution witness and withheld immunity for Alan's testimony as a defense witness, thereby violating defendant's constitutional rights to due process, compulsory process, and a fair trial. We are not persuaded.

Our Supreme Court has held that a prosecutor is " 'not under a general obligation to provide immunity to witnesses in order to assist a defendant.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1051.) Furthermore, "California courts have no authority to confer use immunity on witnesses." (*Ibid.*) However, some federal courts have concluded that a defendant's right to due process may be violated by a prosecutor's refusal to immunize a defense witness in certain situations. (*Id.* at pp. 1051-1053, citing *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243, 251-257.) To establish such a violation, the defendant must show that the prosecutor's refusal was deliberately designed

---

[8] Indeed, defendant tried to have himself qualified as an expert witness on the subject.

to distort the factfinding process, or that the refusal resulted in the loss of testimony that was clearly exculpatory and essential to the defense. (*People v. Masters, supra,* at pp. 1051-1053.) Defendant argues the prosecutor's refusal to extend immunity to Alan as a defense witness was part of a deliberate effort to distort the factfinding process. We do not see it that way.

As previously discussed, Alan testified for the prosecution under a grant of immunity and was cross-examined by defendant at length. As relevant here, Alan testified that he consulted with attorneys, conducted his own research, and believed that defendant's mortgage rescission program was legal. Alan also agreed with defendant that they intended to turn control of the entities holding distressed properties over to participating homeowners "at some point."

Defendant argues that Alan's testimony was so helpful to the defense, and so unhelpful to the prosecution, that the prosecutor resolved to silence Alan by withdrawing immunity and driving him from the stand. Although some of Alan's testimony may have been somewhat helpful to the defense, much of it was not, and we do not perceive any basis for concluding, as defendant urges, that the prosecutor was motivated to refuse to extend immunity to Alan in an effort to silence him. And even assuming arguendo that the prosecutor had such a motive, we cannot conclude that the selective grant of immunity had the effect of distorting the fact-finding process, such that defendant was denied his right to a fundamentally fair trial. As the People observe, defendant cross-examined Alan for days and had ample opportunity to explore any testimony he deemed favorable. And, though defendant's cross-examination was limited to matters within the scope of Alan's direct examination (Evid. Code, § 773, subd. (a)), there was no reason Alan could not have been asked about defendant's business practices and reputation in the community. These subjects were not only well within the scope of permissible cross-examination, they were also the subjects that defendant said he hoped to cover with Alan as a defense witness. Although defendant also wanted Alan to authenticate documents

31

and corroborate his own testimony in some unspecified way, we cannot conclude that the refusal to extend immunity for such testimony amounts to a deliberate distortion of the fact-finding process resulting in a denial of defendant's right to a fair trial. On the record before us, where defendant thoroughly cross-examined Alan under a grant of immunity and identifies no specific exculpatory evidence that might have been adduced had Alan testified as a witness for the defense, we conclude that the refusal to extend the grant of immunity cannot be said to have so distorted the fact-finding process as to deny defendant's right to a fundamentally fair trial. We therefore conclude that defendant has failed to establish a due process violation.

*H.     Limitations on John's Testimony*

Defendant raises two contentions arising from his examination of John. First, defendant contends the trial court erred in sustaining the prosecutor's hearsay objections to questions about what was said during the August 2011 meeting. Second, defendant contends the trial court erred in refusing to allow defendant to recall John once he had familiarized himself with the hearsay rules. We conclude that the first contention is not properly before us, and the second lacks merit.

Defendant argues he was attempting to offer John's out of court statements for the nonhearsay purpose of showing their effect on him as the listener, thereby explaining why he believed his mortgage rescission program to be legal. We need not consider the merits of this argument, as we conclude defendant failed to preserve it.

The trial court repeatedly pressed defendant for a theory of admissibility, both before John took the stand and during the course of defendant's direct examination. Defendant never articulated any theory that John's out-of-court statements were being offered for the nonhearsay purpose of showing their effect on him as the listener. Although defendant referred, at one point, to his "understandings of what the law required," he did so in the context of a meandering, convoluted argument that cannot be expected to have put the trial court on notice of his current theory of admissibility. And

32

defendant never came close to articulating any such theory again, despite multiple opportunities to do so. Defendant's failure to raise this theory of admissibility in the trial court forfeits the claim on review. (Evid. Code, § 354; *People v. Pearson* (2013) 56 Cal.4th 393, 470, fn. 10.)

Defendant's second contention—that the trial court erred in refusing to allow him to recall John after he had reviewed the hearsay rules—fares no better. The trial court has " 'inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice.' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 951; §1044; see Evid. Code, § 765.) Evidence Code section 765 affords the trial court broad discretion to control the interrogation of witnesses. (*People v. Chenault* (2014) 227 Cal.App.4th 1503, 1514.) On appeal, we review the trial court's exercise of authority under Evidence Code section 765 for abuse of discretion. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175.)

Here, defendant had a full and fair opportunity to examine John, but chose to end the examination when he found himself unable to overcome the prosecutor's hearsay objections. Although John was excused subject to recall, the trial court could reasonably conclude that defendant was not entitled to a second bite of the apple, particularly in light of the fact that John had been excused for a week, and the trial was by then entering its fourth month. The trial court did not abuse its discretion in denying defendant's request to recall John.

I. *CALCRIM No. 375*

Next, defendant contends the trial court prejudicially erred—and deprived him of due process and a fair trial—by giving an argumentative instruction under CALCRIM No. 375. According to defendant, the instruction was argumentative because: (1) it directed the jury to find that defendant's prior convictions were "similar" to the charged offenses, and his defense the same ("The People also presented evidence the defendant had previously committed other, similar offenses—specifically, conspiracy to impair and

33

impede the IRS, conspiracy to commit witness tampering, aiding and abetting witness tampering and conspiracy and that his defense at trial to those offenses was his defense in this case: mistake of law"); and (2) it directed the jury to find that the prosecution's "other acts" evidence had "specific" "relevance" to the case (see CALCRIM No. 375 [setting forth "specific grounds of relevance" for evidence of uncharged offenses to prove identity, intent, common plan, etc.]). The People respond that defendant forfeited the claim of error by failing to object in the trial court, and, in any case, the claim lacks merit. We agree with the People.

"Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Here, there is no question that CALCRIM No. 375 was correct in law and responsive to the evidence. It is also undisputed that defendant failed to object or request modification of CALCRIM No. 375 in the trial court. Having failed to object in the trial court, defendant has forfeited the claim of instructional error on appeal. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.)

Even assuming the claim was not forfeited (§ 1259), we would conclude the contention fails on the merits. An argumentative instruction is one that highlights specific evidence and invites the jury to draw inferences favorable to one of the parties from the specified items of evidence. (*People v. Earp* (1999) 20 Cal.4th 826, 886.) Here, though defendant's uncharged offenses were described as "similar" to the charged offenses, and his defense identified as the same, the jury was not invited or compelled to draw any inference from this evidence, and CALCRIM No. 375 did not suggest the court's opinion. Similarly, though CALCRIM No. 375 referred to "specific grounds of relevance," the enumerated grounds (identity, intent, common plan, etc.) were permissible inferences under Evidence Code section 1101, subdivision (b), and did not serve to remove any question concerning defendant's knowledge and intent from the jury.

34

As given here, CALCRIM No. 375 was a limiting instruction designed to protect defendant from improper inferences. The trial court did not err in giving the instruction.

J.    *Section 654*

Defendant argues the trial court should have stayed the sentence for counts 17, 20 to 25, and 27 to 28 pursuant to section 654. The People concede the sentence should have been stayed for count 21, and we accept the concession. We need not consider defendant's argument with respect to counts 20 or 28, as we are reversing those convictions. We reject defendant's argument with respect to the remaining counts.

Section 654, subdivision (a) states: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Our Supreme Court has long held that "[s]ection 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, italics omitted.) "In such circumstances, the court must impose but stay execution of sentence on all of the convictions arising out of the course of conduct except for the offense with the longest sentence." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) Sentences must be stayed to the extent that section 654 prohibits multiple punishment, regardless of whether the sentences are imposed concurrently or consecutively. (*People v. Jones* (2012) 54 Cal.4th 350, 353.)

A trial court's finding of separate intents or objectives is "a factual determination that must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.) This deferential standard of review applies whether

35

the trial court's findings are explicit or implicit. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.) "Thus, '[w]e review the trial court's finding "in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*)

1. *Punishment Imposed on Counts 22 to 25*

Defendant was convicted in count 22 of attempted theft of the Azalea Road property (§§ 664/487) between August 8, 2013, and September 27, 2013. He was convicted in count 5 of identity theft (§530.5, subd. (a)) for using J.P. Morgan's name on the grant deed recorded against the Azalea Road property on August 8, 2013. He argues the sentence on count 22 should have been stayed because the conviction was "based on the same conduct" and "involve the same objective and intent of attempting to take the property from[ J.P.] Morgan" as count 5. He makes the same argument with respect to the attempted theft and identity theft convictions connected to Iceberg Road (counts 23 and 7), Woodfield Way (counts 24 and 8), and Cornelia Way (counts 25 and 9). We are not persuaded.

Here, the jury heard evidence that defendant committed identity theft by recording false grant deeds against the Azalea Road, Iceberg Road, Woodfield Way, and Cornelia Way properties (hereinafter, the properties) as an authorized representative of J.P. Morgan (for Azalea Road and Cornelia Way) and Fannie Mae (for Woodfield Way and Iceberg Road). The jury also heard evidence that defendant tried to sell the properties to investors through Orange Coast Title. Although both sets of crimes involved real property, there was substantial evidence from which the trial court could have reasonably inferred that defendant committed identity theft and attempted theft on different occasions, and with different intents and objectives. (*People v. Lopez, supra*, 198 Cal.App.4th at pp. 717-718 ["Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the

36

defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken' "].) The trial court did not err by executing sentence on counts 22 to 25.

2. *Punishment Imposed on Counts 17, 20, 21, and 27*

Defendant argues the sentence on count 20 for theft of money and personal property from Hector (§ 487, subd. (a)) should have been stayed because the crime involved the same conduct as count 1 for collecting advance fees as a foreclosure consultant (Civ. Code, § 2945.4, subd. (a)). Not so. As the People observe, count 20 also encompassed the monthly lease payments that Hector paid from April through September 2011. The trial court could reasonably conclude that defendant harbored a different criminal objective in committing theft through the collection of monthly rental payments than he did in violating Civil Code section 2945.4, subdivision (a) by collecting improper advance fees as a foreclosure consultant.

Defendant also argues the sentence on count 27 for theft of money and personal property from the Becks (§ 487, subd. (a)) should have been stayed because the crime involved the same conduct as count 29 for collecting advance fees as a foreclosure consultant (Civ. Code, § 2945.4, subd. (a)). We need not consider this contention as we are reversing the conviction on count 29.

Next, defendant contends that the sentence on count 21 for attempted theft of Hector's Walnut Avenue property (§§ 664/487, subd. (a)) should have been stayed because it involved the same conduct and intent as count 2 for engaging in a prohibited practice by acquiring an interest in a residence in foreclosure (Civ. Code, § 2945.4, subd. (c)). The People concede the issue, and we accept the concession.

Defendant also argues the sentence on count 17 for burglary of the School Street property (§ 459) should have been stayed because it involved the same intent and objective as count 28 for theft of the School Street property (§ 487, subd. (a)). We disagree. The burglary was a separate act, committed at a different time, against a

37

different victim. The trial court could reasonably conclude that the crimes were committed with different intents and objectives.

*K.     Burglary Conviction (Count 17)*

Defendant was found guilty in count 17 of second degree burglary for entering the School Street property following the trustee's sale in which Fannie Mae acquired the property. At sentencing, the trial court found that the conviction was for commercial burglary, as the School Street property was unoccupied at the time of the offense, and no property was taken. Accordingly, the trial court reduced the conviction to misdemeanor shoplifting under Proposition 47, and sentenced defendant to one year consecutive for count 17.

The parties agree that the trial court erred in reducing the burglary conviction to misdemeanor shoplifting, as the School Street property was an unoccupied residence and not a commercial establishment. (See generally § 459.5, subd. (a) [defining misdemeanor shoplifting as "entering a commercial establishment with intent to commit larceny while that establishment is open during regular business hours"]; *People v. Holm* (2016) 3 Cal.App.5th 141, 146-147 [construing the term "commercial establishment"].) The parties also agree that the trial court should have sentenced defendant to eight months consecutive for second degree burglary, rather than one year. We agree and shall direct the trial court to resentence defendant on count 17.

*L.     Section 12022.6*

Defendant argues we must strike the punishment imposed by section 12022.6, as that section has been repealed, and his case is still pending on appeal. (*In re Estrada* (1965) 63 Cal.2d 740, 748 (*Estrada*); *People v. Rossi* (1976) 18 Cal.3d 295, 304; *People v. Collins* (1978) 21 Cal.3d 208, 212 [repeal of criminal statute without a savings clause terminates all criminal prosecutions not reduced to final judgment].) Defendant argues this issue is controlled by *People v. Nasalga* (1996) 12 Cal.4th 784 (*Nasalga*), in which our Supreme Court determined that the defendant, whose conviction was not yet final,

was entitled to the benefit of the reduced sentence enhancement of the 1992 amendment to section 12022.6, which became operative after the defendant committed the crime. (*Nasalga, supra,* at p. 787.) *Nasalga* does not help defendant. In *Nasalga,* the defendant argued because section 12022.6 was amended prior to final judgment in her case, and because the amendment reduced the punishment for the threshold dollar amount of the property loss from two years to one year, she was entitled to the benefit of the amendment. (*Nasalga, supra,* at pp. 789-790.) Because the statute did not contain an express saving clause, the Court looked for other indications of legislative intent to apply the amended statute prospectively. (*Id.* at p. 794.) The Court found that nothing in the legislative history of section 12022.6 demonstrated the intent to punish persons whose theft occurred before the statutory amendment more harshly than others whose theft of the same amounts occurred after the amendment, commensurate with inflation. (*Nasalga, supra,* at p. 795.) In view of the Legislature's failure to amend section 12022.6 to express its intent that the amendments apply prospectively only, the Court held that the defendant was entitled to the reduced punishment. (*Nasalga, supra,* at pp. 797-798.)

After *Nasalga* was decided in 1996, the Legislature amended section 12022.6. (Stats. 2007, ch. 420, § 1, p. 3635; Stats. 1998, ch. 454, § 2, p. 3228; Stats. 1997, ch. 551, 2, p. 3333.)[9] The 2007 amendments to section 12022.6 were operative during defendant's trial and sentencing.[10] In examining the amended statute and its legislative

---

[9] In 2010, the Legislature reenacted section 12022.6 as part of a nonsubstantive reorganization of deadly weapons statutes prepared by the California Law Revision Committee, as directed by prior legislation. (Senate Com. on Public Safety, Analysis of Senate Bill No. 1080 (2009-2010 Reg. Sess.) as amended March 23, 2010.) Because the reorganization did not alter section 12022.6, the 2007 amendments to section 12022.6 are operative here.

[10] The 2007 amendment raised the monetary thresholds for imposition of the sentence enhancements. (Stats. 2007, ch. 420, § 1, p. 3635.)

39

history, we do not find evidence to show that the Legislature intended to apply the planned repeal of the statute to ameliorate punishment for offenses committed throughout its effective period. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1049.)

In amending section 12022.6, presumably aware of the Court's holding in *Nasalga*, the Legislature stated: "It is the intent of the Legislature that the amendments to Section 12022.6 of the Penal Code by this act apply prospectively only and shall not be interpreted to benefit any defendant who committed any crime or received any sentence before the effective date of this act." (Stats. 2007, ch. 420 (Assem. Bill No. 1705) § 2; cf. *People v. Green* (2011) 197 Cal.App.4th 1485, 1489, fn. 3 [holding that the higher monetary threshold amounts enacted in 2007 applied prospectively only].) In enacting substantive changes to section 12022.6 in 2007, the Legislature considered the Assembly Floor Analysis, which states in part, " 'Penal Code Section 12022.6, enacted approximately [40] years ago on July 1, 1977, is one of California's original determinate sentencing enhancements. The excessive takings enhancements are extremely important in the prosecution of "white-collar" crime in California. Without the enhancements, the penalties for the theft or destruction of property worth $2.5 million are the same as the theft of property worth $[900].' " (Assem. Floor Analysis, Concurrence in Senate Amendments of Assem. Bill No. 1705 (2007-2008 Reg. Sess.) as amended July 9, 2007, p. 2.)

We conclude the Legislature has demonstrated its intent with sufficient clarity to show the planned repeal of section 12022.6 applies prospectively only. (*In re Pedro T., supra,* 8 Cal.4th at p. 1049.) There is no evidence of a contrary legislative purpose to ameliorate punishment for persons who stole in excess of the monetary threshold amounts during the effective period of the statute. (*Ibid.*) Thus, the repeal of section 12022.6 does not apply to mitigate defendant's punishment.

*M.      Fines, Fees, and Assessments*

Finally, defendant argues the trial court erred by imposing fines, fees, and assessments without finding that he had the ability to pay them.  As noted, the trial court imposed various fines, fees, and assessments, including a restitution fine of $4,800 (§ 1202.4), a parole revocation fine of $4,800 (§ 1202.45), which was stayed, a $1,200 court operations assessment (§ 1465.8), and a $900 court facilities assessment (Gov. Code, § 70373).  Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant argues the imposition of these fines, fees, and assessments without an ability-to-pay hearing was a violation of his right to due process under the U.S. and California Constitutions.  We assume without deciding that *Dueñas* was correctly decided.  (But see *People v. Hicks* (2019) 40 Cal.App.5th 320, 322 [concluding that *Dueñas* was wrongly decided].)  Even so assuming, we conclude that defendant's reliance on *Dueñas* is misplaced.

In *Dueñas*, the defendant was an indigent, homeless mother of two young children, afflicted with cerebral palsy, and barely surviving on public assistance. (*Dueñas, supra,* 30 Cal.App.5th at pp. 1160-1161.)  Her driver's license had been suspended because she was unable to pay three juvenile citations, and she subsequently suffered a series of misdemeanor convictions for driving with a suspended license.  (*Id.* at p. 1161.)  In each case, she "was offered the ostensible choice of paying a fine or serving jail time in lieu of payment," but each time she was unable to pay and thus served time in jail.  (*Ibid*.)  When she suffered another misdemeanor conviction for driving with a suspended license, she asserted that she was homeless and receiving public assistance and asked the trial court to set a hearing to determine her ability to pay.  (*Id.* at p. 1162.)  The trial court struck some fees, but imposed the court facilities and court operations assessments, ruling that they were mandatory regardless of her inability to pay.  (*Id.* at p. 1163.)  On appeal, the *Dueñas* court found it was a violation of constitutional due process to impose the court assessments required by section 1465.8 and Government Code

41

section 70373, neither of which was intended to be punitive, without finding that the defendant has the ability to pay them. (*Dueñas, supra,* at p. 1168.) The court also found that, although a restitution fine imposed under section 1202.4 was considered additional punishment for defendant's crime, that fine posed constitutional concerns because the trial court was precluded from considering ability to pay when imposing the minimum fine authorized by the statute. (*Dueñas, supra,* at pp. 1170-1171.) To avoid the constitutional problem, the court held that section 1202.4 requires a trial court to impose a minimum fine regardless of ability to pay, but that execution of the fine must be stayed until the defendant's ability to pay is determined. (*Dueñas, supra,* at p. 1172.)

In this case, the trial court imposed the same court facilities and court operations assessments that were imposed in *Dueñas*, as well as other, more substantial, fines and fees. Unlike the defendant in *Dueñas,* however, defendant did not request a hearing regarding his ability to pay any fines or fees, or object to them on any factual or legal ground. Thus, he forfeited his claim that the fines should not have been imposed on him. (*People v. McCullough* (2013) 56 Cal.4th 589, 596-597 [appellate forfeiture rule applies to challenge to the sufficiency of evidence supporting a booking fee under Government Code section 29550.2, subdivision (a)]; *People v. Avila* (2009) 46 Cal.4th 680, 729 [forfeiture rule applies to defendant's claim that restitution fine amounts to an unauthorized sentence based on his inability to pay]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [claim that trial court erroneously failed to consider ability to pay a restitution fine forfeited by failure to object]; *People v. Acosta* (2018) 28 Cal.App.5th 701, 705 [forfeiture rule applies to fines, penalty assessments, and administrative fees pursuant to § 290.3].)

Defendant argues his due process challenge to his sentence is not forfeited because it raises a pure question of law. We disagree; defendant's challenge is premised on an alleged inability to pay, which is a factual issue that was not raised in the trial court. Alternatively, defendant argues that a due process objection to his fines would have been

futile because he did not have the benefit of the *Dueñas* decision at the time of his sentencing hearing. (See *People v. Castellano* (2019) 33 Cal.App.5th 485, 488-489; but see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154-1155 [positing that *Dueñas* was based on settled principles of due process].) However, the fact that *Dueñas* announced a new rule is beside the point of this case. Forfeiture did not result from defendant's failure to make a due process objection but rather from his failure to request a hearing or otherwise dispute his ability to pay any of the fines.

In contrast to *Dueñas*, defendant's ability to pay was a statutory consideration with respect to some of the most significant fees and fines imposed, including the $4,800 restitution fine. (See § 1202.4, subd. (d) [outlining factors the trial court must consider when setting the amount of a restitution fine above the $300 statutory minimum, including the defendant's "inability to pay"].) If defendant believed he was unable to pay any of the foregoing fines and fees, it was incumbent on him to object at sentencing and request an ability-to-pay hearing. (*People v. Nelson, supra,* 51 Cal.4th at p. 227.) Unlike the defendant in *Dueñas,* he had a statutory right to an ability-to-pay hearing that he failed to exercise, thereby forfeiting his claim that such a hearing was required. (*Ibid.*) We therefore reject defendant's request that we remand for an ability to pay hearing.

### III. DISPOSITION

The judgment is reversed with respect to counts 3 and 26 (§ 115), 20 and 28 (§ 487, subd. (a)), 29 (Civ. Code, § 2945, subd. (a)), and 30 (Civ. Code, § 2945.4, subd. (e)). We remand for resentencing in accordance with this opinion. In all other respects, the judgment is affirmed.

/S/

_____

RENNER, J.

I concur:

/S/

_____

HULL, Acting P. J.

44

Mauro, J., Concurring.

I fully concur in the majority opinion except for part II.M., pertaining to the imposed fines, fees, and assessments, in which I concur in the result.

In prior opinions I have generally been disinclined to find that a defendant forfeited a claim based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 because, among other things, *Dueñas* was not a sufficiently foreseeable extension of case law. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138.)  However, I have concurred in the affirmance of judgments imposing fines, fees, and assessments when the record showed that the defendant obtained significant financial gain from the crimes.  This is such a case.  Accordingly, as to part II.M. of the majority opinion, I concur in the result.

/S/

_____

MAURO, J.

1